# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
FORT LEE OFFICE LLC AND MEYER CHETRIT,

                                   Index No.:

                Plaintiffs,

        -against-                        **SUMMONS**

COMPUTERSHARE TRUST COMPANY,
NATIONAL ASSOCIATION, as Trustee for the
benefit of the registered holders of BBCMS
MORTGAGE TRUST 2023-C19, COMMERCIAL
MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2023-C19.

                Defendant.
-------------------------------------------------------------------X

**TO THE ABOVE-NAMED DEFENDANTS**:

       YOU ARE HEREBY SUMMONED to answer the Complaint in this action and serve a copy of your answer on Plaintiff's undersigned attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service (or thirty (30) days if this Summons is not personally delivered to you within the State of New York). In case of your failure to appear or answer, judgment will be taken against you by default, in accordance with the Complaint herein.

       Plaintiff designates New York County as the place of trial. Venue is proper in New York County pursuant to CPLR § 503(c), as Defendant is a resident of New York County. Venue is also proper under CPLR § 501, as a certain agreement requires venue of legal proceedings brought under it in such county, and this lawsuit is brought under that agreement.

Dated:  New York, New York
       November 25, 2024

                            **JACOBS P.C.**

                  By:     */s/ Muriel Raggi*
                         Muriel Raggi, Esq.
                         595 Madison Avenue, 39th Floor
                         New York, New York 10022
                         (212) 229-0476
                         *Attorneys for Plaintiffs*

1

Defendant's Address(es):

COMPUTERSHARE TRUST COMPANY,
NATIONAL ASSOCIATION
150 Royall Street
Canton, Massachusetts 02021

COMPUTERSHARE TRUST COMPANY,
NATIONAL ASSOCIATION
1290 Avenue of the Americas, 9th Floor
New York, New York 10104

BBCMS MORTGAGE TRUST 2023-C19,
COMMERCIAL MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2023-C19
745 Seventh Avenue
New York, New York 10019

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
FORT LEE OFFICE LLC AND MEYER CHETRIT,

Index No.:

Plaintiffs,

-against-

COMPUTERSHARE TRUST COMPANY,
NATIONAL ASSOCIATION, as Trustee for the
benefit of the registered holders of BBCMS
MORTGAGE TRUST 2023-C19, COMMERCIAL
 MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2023-C19.

Defendant.
-------------------------------------------------------------------X

**VERIFIED COMPLAINT**

Plaintiffs FORT LEE OFFICE LLC and MEYER CHETRIT ("Plaintiffs"), by their attorneys, JACOBS P.C., complaining of the defendants herein, respectfully allege as follows:

## INTRODUCTION

1.      Plaintiffs are filing this lender liability action to recover tens millions of dollars in damages caused by Defendant COMPUTER SHARE TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE REGISTERED HOLDERS OF BBCMS MORTGAGE TRUST 2023-C19, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2023-C19's ("Defendant" or "CTC") gross mismanagement of the funds generated by the Subject Property, as that term is defined below, since the inception of CTC's tenure as the lender with respect to a $54,500,000.00 loan in or about March 2023.

2.      At the outset of purchasing the Subject Property, Plaintiffs invested more than forty million dollars ($40,000,000.00) of their own capital for the purchase and improvement of the Subject Property.  Because of Defendants' breaches of contract, mismanagement of the Subject

1

Case 1:24-cv-09979-KPF    Document 1-1    Filed 12/27/24    Page 5 of 29

Property's income, and brazen efforts to prevent Plaintiffs from accessing funds necessary for covering operating expenses, the Subject Property has fallen into disrepair, is subject to mechanic's liens and code violations from the city, and is behind hundreds of thousands of dollars in utilities.

3.      That is, in violation of New York law, Defendants unilaterally took control of the Subject Property such that Plaintiffs were unable to pay the Subject Property's monthly expenses.

4.      This self-help maneuver was to accomplish one goal: to manufacture a default under the Loan's terms.  As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have lost the value of their investment and are subject to foreclosure proceedings by Defendants, which is nothing more than a ruse.

5.      Upon becoming the lender for the Subject Property in or about April 2023, CTC immediately materially breached the terms of the loan documents, described below, by failing to disburse hundreds of thousands of dollars in reserves to Plaintiffs that were earmarked for initial property repairs and that were required by the operative loan agreement to be disbursed to Plaintiffs.

6.      Around that same time, CTC assumed management of all funds generated by the Subject Property, including rental income, and was required to disburse funds for operating expenses to Plaintiffs.  However, CTC mismanaged the funds and never fully funded the operating expenses, causing Plaintiffs to have to manage the property without any money.

7.      Adding insult to injury, since about November 2023, CTC has withheld from Plaintiffs approximately $350,000.00 in insurance proceeds for a casualty that occurred at the Subject Property.  Plaintiffs are entitled to these funds and need them to pay for necessary repairs.

8.      In or about December 2023, due to its own miscalculation, CTC began depositing monthly approximately $120,000.00 more than necessary into escrow for insurance thereby

2

causing a shortfall in funds available for operating expenses totaling approximately $650,000.00. Beginning in or about January 2024, CTC declared that there was no money available for operating expenses and stopped disbursing funds to Plaintiffs for that purpose. When Plaintiffs brought this monthly miscalculation to Defendant's attention, CTC stubbornly did not disburse the improperly withheld funds to Plaintiffs to cover operating expenses.

9. As a result of Defendants' mismanagement of funds, Plaintiffs have incurred millions of dollars in damages because: i) the Subject Property has fallen into disrepair and behind on utilities, ii) Plaintiffs have funded $564,637.00 in operating expenses from their own capital but have been unable to cover all necessary expenses, iii) Plaintiffs have not had the capital needed to repay the loan, and iv) Defendants have capitalized on the rotten fruits of their wrongdoing by declaring a default, accelerating the loan, seeking interest at the default rate, and filing foreclosure proceedings on the Subject Property.

## THE PARTIES

10. At all times hereinafter mentioned, plaintiff FORT LEE OFFICE LLC ("FLO") is and was a limited liability company organized under the laws of Delaware, with a principal place of business located at 512 7th Avenue, New York, New York, 10018.

11. At all times mentioned herein, plaintiff Meyer Chetrit is and was a natural person residing in the State of New York and a principal of Fort Lee Office LLC.

12. At all times mentioned herein, defendant CTC is and was a national banking association organized under the laws of the United States and the holder of a loan and related documents pertaining to real property located in Bergen County at 2 Executive Drive, Fort Lee, New Jersey 07024 (the "Subject Property"). CTC conducts business in the State of New York and maintains an office at 1290 Avenue of the Americas, 9th Floor, New York, New Yok 10104.

3

13.     BBCMS MORTGAGE TRUST 2023-C19, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2023-C19 (the "Trust") is a trust administered by CTC as trustee.  The Trust maintains an office at 745 Seventh Avenue, New York, New York 10019.

## JURISDICTION AND VENUE

14.     The Loan Agreement, as that term is defined below, provides that disputes related to the  construction of, validity of, and performance under the Loan Agreement, any related note, and other loan documents, as well as any obligations arising under those documents, shall be governed by New York law.

15.     Specifically, Section 10.3(a) of the Loan Agreement states that the agreement was "negotiated in the State of New York, the Loan was made by Lender and accepted by Borrower in the State of New York, and the proceeds of the Loan delivered pursuant hereto were disbursed from the State of New York, which state the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby."

16.     Section 10.3(b) of the Loan Agreement provides that any lawsuit against the lender or borrower arising out of or relating to the Loan Agreement and other loan documents shall be instituted in any federal or state court sitting in New York County in the State of New York.

17.     FLO and Mr. Chetrit are both residents of the State of New York and New York County.

18.     The Trust is a resident of the State of New York and New York County.

19.     CTC conducts business in the State of New York and maintains an office in New York.

4

## **THE SUBJECT PROPERTY**

20.     The Subject Property has a nine-story, 291,000 square foot brick mixed-use building (the "Building") with a parking garage underneath (the "Built-In Parking Garage").

21.     The Building contains commercial office and retail suites on floors one through five (the "Commercial Units").

22.     The Building contains residential apartment units on floors six through nine (the "Residential Units").

23.     The Residential Units are comprised of eight studio units, 48 one-bedroom units, and 28 two-bedroom units.

24.     The Subject Property also utilizes a separate eight-story parking garage (the "Freestanding Parking Garage").

## **THE LOAN**

25.     On or about March 8, 2023, FLO and Starwood Mortgage Capital LLC (the "Original Lender") entered into a loan agreement (as may be amended, restated, replaced, supplemented or modified from time to time, the "Loan Agreement") in which the Original Lender issued a loan to FLO for the Subject Property in the original principal loan amount of fifty-four million five hundred thousand dollars ($54,500,000.00) (the "Loan").

26.     A true and correct copy of the Loan Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

27.     Plaintiffs invested more than forty million dollars ($40,000,000.00) of their own capital into the purchase and improvement of the Subject Property.

28.     The Loan Agreement provides for a ten-year term with a maturity date of April 6, 2033 with an interest rate of 6.219% per annum.

5

29.     The Loan Agreement provides that on a monthly basis, FLO must pay the Original Lender, and its successors or assignees (together, the "Lender") interest accruing on the outstanding principal balance plus certain amounts to fund the escrow and reserve accounts.

30.     The Loan Agreement provides that if any principal, interest or other sums due under the Loan are not paid by FLO by the due date, an Event of Default occurs.

31.     The Loan Agreement provides that the interest rate shall increase to 11.219% per annum if an Event of Default occurs.

32.     The Loan Agreement provides that the Lender may accelerate the Loan if an Event of Default occurs.

33.     The Loan Agreement requires FLO to keep the Subject Property in good working order and repair, including by making necessary repairs.

34.     The Loan Agreement required FLO to make certain enumerated "Required Repairs," as defined in the agreement, in accordance with the listed deadlines.

35.     At closing, the lender was required to disburse reserve funds to FLO for the initial required repairs.

36.     The Loan Agreement requires FLO to pay for utility services for the Subject Property.

37.     The Loan Agreement provides that if the "Required Repairs," as that term is defined in the agreement, are not completed by the listed deadlines and FLO fails to diligently take commercially reasonable steps necessary to complete the repairs, an Event of Default occurs.

38.     The Loan Agreement required FLO to address certain "Completion Conditions," as that term is defined in the agreement, by July 6, 2023.

6

39.     The "Completion Conditions" included, among other things, maintenance of fire sprinklers, replacing ceiling tiles, and fire alarm maintenance.

40.     The Loan Agreement provides that in the event the Subject Property is damaged by fire or other casualty, FLO shall give notice to the lender and commence repairs.

41.     The Loan Agreement provides that FLO must pay for the costs of all repairs stemming from damage caused by fire or other casualty.

42.     The Loan Agreement provides that FLO would not incur or assume any lien against the Subject Property subject to certain exceptions.

43.     The Loan Agreement provides that if a lien against the Subject Property, which is not excepted under the terms of the agreement, is incurred or assumed, FLO will pay the lien.

44.     On or about March 8, 2023, FLO executed a promissory note in favor of the Lender for the original principal amount of fifty-four million five hundred thousand dollars ($54,500,000.00) (the "Promissory Note").

45.     A true and correct copy of the Note is attached hereto as Exhibit B and is incorporated herein by reference.

46.     That same day, FLO executed a mortgage, assignment of leases and rents and security agreement, dated March 8, 2023, in favor of the Lender (the "Security Instrument").

47.     A true and correct copy of the recorded Security Instrument is attached hereto as Exhibit C and incorporated herein by reference.

48.     Pursuant to the Security Instrument, FLO granted the Lender a mortgage lien on the Subject Property.

7

49.     Pursuant to the Security Instrument, FLO assigned to the Lender FLO's rights, title and interest in and to then current and future leases for and rents from the Subject Property (respectively, the "Leases" and "Rents").

50.     The Security Instrument provides that when an Event of Default occurs, and while it continues to occur, the Lender may accelerate the Loan such that the entire outstanding principal amount is due immediately.

51.     The Security Instrument provides that when an Event of Default occurs, and while it continues to occur, the Lender may initiate foreclosure proceedings on the Subject Property.

52.     The Security Instrument provides that when an Event of Default occurs, and while it continues to occur, the Lender may apply for the appointment of a receiver.

53.     On or about March 8, 2023, FLO and the Original Lender executed an assignment of leases and rents agreement (the "ALR").

54.     A true and correct copy of the ALR is attached hereto as Exhibit D.

55.     Pursuant to the ALR FLO assigned and granted the lender FLO's rights and interests in the Leases and Rents.

56.     By granting the lender rights and interests in the Leases and Rents, the lender, including CTC and the Predecessor Lenders, became the landlord for the Subject Property.

57.     Pursuant to the ALR the Lender granted FLO a revocable license to collect, receive and use the Rents and to act as the landlord under the Leases.

58.     The Security Instrument provides that when an Event of Default occurs, and while an Event of Default continues to occur, the license granting FLO the rights to the Leases and Rents is automatically revoked.

8

59. Following Loan closing and pursuant to the loan documents, the lender and its assigns were obligated to transfer several hundred thousand dollars to FLO.

## ASSIGNMENT OF THE LOAN

60. On or about March 8, 2023, the Original Lender executed an omnibus assignment and related agreements in which it assigned the Loan and all related documents to Starwood Mortgage Funding II LLC (the "First Interim Lender").

61. On or about April 27, 2023, the First Interim Lender executed a general assignment agreement and related agreements in which it assigned the Loan and all related documents to Starwood Mortgage Capital LLC (the "Second Interim Lender" and together with the Original Lender, the First Interim Lender, and the Second Interim Lender, the "Predecessor Lenders").

62. On or about April 27, 2023, the Second Interim Lender executed a general assignment agreement and related agreements in which it assigned the Loan and all related documents to CTC.

63. Pursuant to the Loan Agreement, CTC, as the Predecessor Lender's successor and assignee, was required to transfer to FLO several hundred thousand dollars following the closing of the Loan.

64. Neither CTC nor the Predecessor Lenders paid FLO as required after closing.

65. CTC's failure to pay FLO hundreds of thousands of dollars as required after closing caused contractors to file mechanic's liens against the Subject Property due to non-payment.

66. CTC's failure to pay FLO hundreds of thousands of dollars as required after closing caused Plaintiffs to have to pay to cure mechanic's liens against the Subject Property by rendering payment from their own assets.

9

67. CTC's failure to pay FLO hundreds of thousands of dollars as required after closing constituted a breach of the Loan Agreement.

68. CTC and the Predecessor Lenders also failed to fulfill their other obligations to FLO under the Loan Agreement and related documents.

## SERVICING OF THE LOAN

69. On or about March 15, 2023, Wells Fargo Bank, NA ("Wells Fargo") became the servicer for the Loan.

70. After purportedly being assigned the Loan, CTC assigned KeyBank National Association ("KeyBank") as the master servicer for the Loan.

71. After purportedly being assigned the Loan, CTC assigned K-Star Asset Management LLC ("K-Star"), a Kohlberg Kravis Roberts & Co. L.P. ("KKR") company, as special servicer for the Loan.

72. On or about April 28, 2023, CTC executed a limited power of attorney authorizing K-Star to act on behalf of CTC.

73. As special servicer and master servicer, respectively, for the Loan, K-Star and KeyBank acted as agents of CTC.

74. Since approximately January 23, 2024, Plaintiffs have been denied access to the loan portal for the Loan.  That is, as of January 23, 2024, Plaintiffs—despite being owners of the Subject Property—lost the ability to pay the Subject Property's monthly bills with no prior notice from Defendants.

## ADMINISTRATION OF THE ACCOUNTS

75. At the time the Loan closed, the lender held approximately $230,438.00 in a replacement reserve account.

76.     At the time the Loan closed, the lender held approximately $1,725,000.00 in a rollover reserve account.

77.     At the time the Loan closed, the lender held approximately $22,550.00 in reserves for immediate repair.

78.     FLO was required to establish and maintain a clearing account pursuant to Section 2.7.1 of the Loan Agreement (the "Clearing Account").

79.     The Clearing Account was under the sole dominion and control of CTC.

80.     All rent payments received by FLO or the Subject Property's manager were required to be deposited into the Clearing Account within three business days of receiving the payment.

81.     After the loan was assigned to CTC, FLO's access to the loan portal and servicing information for the Subject Property was removed without any notice.

82.     Once CTC became the lender, FLO was prevented from viewing rental income and the Subject Property's financial information.

83.     CTC was required to establish and maintain a cash management account pursuant to Section 2.7.2 of the Loan Agreement (the "Cash Management Account").

84.     The Cash Management Account was under the sole dominion and control of CTC.

85.     CTC and K-Star had the sole right to make withdrawals from the Cash Management Account and any associated sub-accounts.

86.     Funds deposited in the Cash Management Account were required to be disbursed pursuant to a waterfall provision in Section 2.7.2(b) of the Loan Agreement (the "Waterfall") unless an Event of Default exists, as that term was defined in the Loan Agreement.

11

87.     First, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to CTC for deposit into a tax and insurance escrow account.

88.     Second, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to the deposit bank for fees and expenses due and payable.

89.     Third, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to CTC for payment of the monthly debt service payment amount.

90.     Fourth, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to CTC for deposit into a replacement reserve account monthly.

91.     Fifth, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to CTC for deposit into the rollover reserve account monthly.

92.     Sixth, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to CTC for deposit into a primary tenant reserve account if certain conditions exist.

93.     Seventh, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to CTC for payment of any other amounts due and payable under the Loan Documents other than the outstanding principal balance.

94.     Eighth, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to FLO in an amount equal to the operating expenses due and payable by FLO during the following month and any CTC-approved extraordinary expenses, as defined in the Loan Agreement.

95.     Ninth, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to an excess cash reserve account as "Excess Cash", as that term is defined in the Loan Agreement, if a Cash Trap Period exists.

96.     Tenth, pursuant to the Waterfall, funds from the Cash Management Account were required to be disbursed to a primary tenant reserve account if a Primary Tenant Cash Trap Period exists.  This disbursement was subject to exceptions.

97.     Eleventh, pursuant to the Waterfall, if no Cash Trap Period exists, the remaining funds from the Cash Management Account were required to be disbursed to FLO.

98.     After an Event of Default pursuant to the Loan Agreement occurs and while it continues to occur, CTC is not required to follow the Waterfall.

99.     After an Event of Default pursuant to the Loan Agreement occurs and while it continues to occur, the Loan Agreement provides that CTC has the discretion to distribute funds in any order and priority until the mortgage has been paid in full.

100.    Since the outset of the Loan, Plaintiffs, their agents and assigns repeatedly requested from CTC financial and other information related to the loan and subject property's operations, as well as release of funds, but were ignored or denied.

101.    In or about April 2023, Plaintiffs' agent demanded from CTC and the Predecessor Lenders documentation of the allocation of funds for the Subject Property.

102.    Defendants refused to provide information about the allocation of funds for approximately one year.

103.    On or about April 12, 2024, Defendants, through their agent, finally provided allocation of funds information.

104.    Upon information and belief, since the Loan's inception, monthly rents collected by CTC on the Subject Property exceeded Plaintiffs' loan obligations and the costs to maintain the Subject Property.

105.    On or about November 6, 2023, CTC through its agent claimed that there was a shortfall of $80,419.

106.    The shortfall was funded by CTC with funds from the operating account.

107.    Since March 8, 2023, Plaintiffs have contributed approximately $564,637.00 in funds from their own capital to the Subject Property to cover operating expenses.

108.    Since January 2024, CTC has not disbursed any funds to Plaintiffs for operating expenses, claiming that there was a shortfall each month.

109.    Any shortfall for operating expenses was the result of CTC and its agent's mismanagement of the Cash Management Account and the Subject Property.

### IMPROPER DEFAULT NOTICES AND DECLARATIONS OF EVENTS OF DEFAULT

110.    Approximately four months after being assigned the Loan, in or about August 2023, CTC began issuing improper and erroneous default notices to FLO.

111.    Upon information and belief, CTC issued the improper default notices to FLO to manufacture an Event of Default as defined under the Loan Agreement.

112.    Upon information and belief, CTC sought to manufacture Events of Default to avail itself of the remedial measures that it would be entitled to take pursuant to the Loan Agreement, Security Instrument and ALR if an Event of Default occurred.

113.    Upon information and belief, CTC sought to avail itself of the remedial measures available to it if an Event of Default occurred for the purpose of enriching itself.

114.    Upon information and belief, CTC manufactured Events of Default in order to accelerate the outstanding loan balance.

115.    Upon information and belief, CTC manufactured Events of Default in order to apply the default interest rate to the loan balance.

14

116.    Upon information and belief, CTC manufactured Events of Default in order to exercise discretion over distribution of funds from the Cash Management Account.

117.    Upon information and belief, CTC manufactured Events of Default in order to cause FLO's license to collect rents to be automatically revoked.

118.    Upon information and belief, CTC manufactured Events of Default in order to foreclose on the Subject Property.

119.    Upon information and belief, CTC sought to manufacture Events of Default in order to seek appointment of a receiver for the Subject Property.

120.    Between on or about August 25, 2023 and on or about May 14, 2024, CTC, through its agent, issued 10 improper default notices to FLO (the "Improper Default Notices").

121.    The Improper Default Notices purport to notify FLO of defaults by FLO under the Loan Agreement.

122.    The Improper Default Notices purported to notify Plaintiffs of defaults related to failures to provide guarantor financial statements and other financial reporting, to cure mechanic's liens, to perform repairs, to cure code violations and to satisfy post-closing requirements.

123.    The purported failures described in the Improper Default Notices were the result of Defendants' mismanagement of the Subject Property's finances.

124.    The Improper Default Notices attempted to declare Events of Default under the Loan Agreement.

125.    The Improper Default Notices threatened that CTC may exercise remedies under the Loan Documents against FLO, including accelerating the Loan, seeking appointment of a receiver, directly collecting the rent, and foreclosing on the Subject Property.

15

126. On or about September 6, 2023, CTC through its agent and power of attorney declared for the first time that an Event of Default had occurred under the loan agreement.

127. On or about September 12, 2023, CTC declared that the default interest rate would be applied to the Loan.

128. By declaring an Event of Default, on or about September 6, 2023, CTC triggered the automatic revocation of the license granting FLO the right to collect, receive and use the Rents and to act as the landlord under the Leases.

129. Therefore, on or about September 6, 2023, CTC became the sole landlord on the Leases for the Subject Property.

130. Under the guise of the Improper Default Notices, CTC improperly withheld millions of dollars from Plaintiffs in funds associated with the Subject Property, including loan reserves, excess insurance escrow, insurance proceeds, parking funds, and funds marked for repairs and upkeep of the Subject Property.

131. CTC's withholding of funds for operating expenses constituted a breach of the Loan Agreement.

132. While improperly withholding funds, CTC applied the funds to accelerated interest or principal on the Loan.

133. While improperly withholding funds, CTC refused to release funds to pay utilities, maintenance costs and other expenses for the Subject Property.

134. CTC's refusal to release funds for operating expenses caused the Subject Property to fall into disrepair.

135. CTC's refusal to release funds for operating expenses caused tenants to withhold rent payments.

16

136.    CTC's refusal to release funds for operating expenses caused the Subject Property to incur violations from the borough of Fort Lee.

137.    CTC's refusal to release funds for operating expenses caused repair work on the Subject Property to be delayed.

138.    CTC's refusal to release funds for operating expenses caused contractors to assert mechanic's liens against the Subject Property due to non-payment for services.

139.    CTC's refusal to release funds for operating expenses caused utility payments for the Subject Property to fall into arrears by hundreds of thousands of dollars.

140.    CTC used the issues caused by its refusal to release funds for operating expenses as the basis to allege that Plaintiffs defaulted under the Loan Agreement in a foreclosure action for the Subject Property filed by CTC in New Jersey.

## IMPROPERLY WITHHELD INSURANCE PROCEEDS

141.    In or about April 2023, the Subject Property experienced a casualty as that term is defined in the Loan Agreement.

142.    The casualty was a fire that damaged at least four residential units and two common areas at the Subject Property.

143.    The damage to the Subject Property resulted in a monthly loss of approximately $30,000 until the units could be re-leased.

144.    In or about April 2023, Plaintiffs filed a claim with the insurance carrier for the Subject Property, invoking coverage for the casualty.

145.    Between April 2023 and November 2023, the Subject Property underwent $350,535.80 in repairs to damage caused by the casualty.

17

146.     In accordance with the Loan Agreement, following the casualty FLO notified CTC of the casualty and initiated repairs.

147.     In or about November 2023, CTC's agent received a check in the amount of $350,535.80 in insurance proceeds for the casualty.

148.     Plaintiffs paid $35,053.58 toward the repairs out of their own funds.

149.     On or about November 14, 2023, Plaintiffs requested disbursement of the $350,535.80 from CTC and its agent to pay for the remainder of the outstanding balance for repairs and to reimburse Plaintiffs for the payment they made out of their own funds.

150.     Between November 2023 and June 2024, Plaintiffs did not receive any disbursement of insurance proceeds.

151.     In or about June 2024, CTC and its agent represented to Plaintiffs that CTC disbursed a portion of the insurance proceeds to an account per instructions received from someone pretending to be Plaintiffs.

152.     CTC claimed that it had been the victim of fraudulent wire instructions from a spoofed email address.

153.     Through the date of this complaint, CTC still has not disbursed any portion of the insurance proceeds to Plaintiffs.

154.     CTC improperly withheld the insurance proceeds from Plaintiffs.

155.     CTC's withholding of the insurance proceeds constituted a breach of the Loan Agreement.

18

## INSURANCE ESCROW OVERAGES

156.    Pursuant to the Loan Agreement, each month CTC withdrew funds from the Cash Management Account and deposited them into escrow for the insurance constant for the Subject Property.

157.    On or about November 13, 2023, CTC's agent notified FLO that the monthly insurance constant for the Subject Property to be deposited into escrow was increasing from $15,977.01 to $135,250.73 beginning in or about December 2023.

158.    The higher monthly insurance constant amount was miscalculated.

159.    The higher monthly insurance constant amount included the cost of the annual policy premium rather than a prorated monthly portion of the annual premium.

160.    The higher monthly insurance constant amount improperly included the policy premiums for the Freestanding Garage and an adjacent property owned by FLO in addition to the annual policy premium for the Subject Property.

161.    From about December 2023 through May 2024, CTC improperly withdrew the higher monthly insurance constant amount from the Cash Management Account.

162.    CTC's improper withdrawal of the higher monthly insurance constant amount resulted in less availability of funds for operating expenses for the Subject Property.

163.    In or about December 2023, the Cash Management Account was short $35,181.82 in funds needed for operating expenses.

164.    Beginning in or about January 2024, there was a shortfall in the Cash Management Account for all operating expenses.

Case 1:24-cv-09979-KPF    Document 1-1    Filed 12/27/24    Page 23 of 29

165.    On or about May 15, 2024, Plaintiffs notified CTC via its agent that CTC's withdrawal of the higher monthly insurance constant amount was improper and that CTC had placed an overage of funds into the insurance escrow account.

166.    CTC did not disburse the overage amount to FLO for operating expenses.

167.    Rather, CTC applied the overage amount to the outstanding Loan interest.

168.    CTC's withdrawal of the higher insurance constant amount constituted a breach of the Loan Agreement.

169.    CTC's failure to disburse the overage amount to FLO for operating expenses constituted a breach of the Loan Agreement.

## EXERCISE OF CONTROL OVER FLO'S BUSINESS

170.    By collecting rent and managing the finances and accounts for the Subject Property, CTC effectively took control over FLO's business.

171.    CTC exercised discretion and control over disbursement of reserve funds, the rent roll, the Cash Management Account, the tax and insurance escrow account, and the Waterfall.

172.    CTC served as landlord on the Subject Property's leases.

173.    CTC and its agent had sole access to the loan portal beginning in or about January 2024.

174.    Plaintiffs reposed faith, confidence and trust in CTC.

175.    Plaintiffs were and are in a position of inequality, dependence and weakness as compared to CTC.

176.    CTC exercised dominion, control and influence over FLO and the Subject Property by, among other things, taking participatory control over FLO, in a manner, which, by operation

of law, transformed CTC from an ordinary lender who did not owe any fiduciary duties to FLO into Plaintiffs' fiduciary.

177. As FLO's fiduciary, CTC owed Plaintiffs the duties of care, honesty, loyalty and to act in the best interests of Plaintiffs.

178. CTC breached its fiduciary duties to Plaintiffs by causing tenants to withhold rent, causing the property to incur violations from the borough of Fort Lee, miscalculating the insurance constant, leaving the Subject Property in disrepair, and failing to ensure operating expenses were covered.

## FORECLOSURE ACTION

179. CTC filed a foreclosure action against FLO related to the Subject Property on or about May 23, 2024.

180. The foreclosure action is *COMPUTERSHARE TRUST COMPANY, NATIONAL ASSOCIATION v. Fort Lee Office, LLC*, SWC-5623-2024.

181. The foreclosure action is pending in New Jersey Superior Court in Bergen County.

182. After filing the foreclosure action, CTC successfully moved the Court for a rent receiver.

## AS AND FOR A FIRST CAUSE OF ACTION

*Breach of Contract*

183. Plaintiff repeats and re-alleges each and every allegation contained in this Complaint as if fully set forth herein.

184. FLO and CTC entered into valid and enforceable contracts, including the Loan Agreement, Security Instrument and ALR.

185. FLO performed its obligations under those agreements.

21

186. Any nonperformance by FLO is excused by CTC's material breach of the agreements.

187. As described above, CTC breached the Loan Agreement by:

    a. Failing to pay CTC hundreds of thousands of dollars following closing as required;

    b. Failing to disburse funds from the Cash Management Account to FLO for operating expenses;

    c. Failing to disburse the casualty insurance proceeds to FLO;

    d. Withdrawing excess insurance escrow payments from the Cash Management Account; and

    e. Failing to disburse the insurance escrow overage to FLO for operating expenses.

188. As a direct and proximate result of CTC's breaches of contract, Plaintiffs suffered and continue to suffer irreparable harm and damages in an amount to be determined by trial but no less than $250 million plus attorneys' fees and costs and interest.

**AS AND FOR A SECOND CAUSE OF ACTION**

*Breach of Implied Covenant of Good Faith and Fair Dealing*

189. Plaintiff repeats and re-alleges each and every allegation contained in this Complaint as if fully set forth herein.

190. The Loan Agreement, Security Instrument, and ALR each contained an implied covenant of good faith and fair dealing.

191. CTC breached the implied covenant of good faith and fair dealing by mismanaging the Subject Property's finances and manufacturing Events of Default and causing the conditions

22

on which the Events of Default were based, including mechanic's liens, unfunded repairs, and violations from the borough of Fort Lee.

192.    CTC filed a foreclosure action against Plaintiffs for the Subject Property based on the manufactured Events of Default.

193.    By mismanaging the Subject Property's finances, CTC caused the value of the Subject Property and the rent roll to decrease.

194.    By manufacturing Events of Default, CTC injured Plaintiffs' right to receive the benefits of the Loan documents.

195.    As a direct and proximate result of CTC's breach of the implied covenant of good faith and fair dealing, Plaintiff was damaged in an amount to be determined at trial but no less than the fair market value of the Subject Property if the Subject Property's finances had been properly managed and the default conditions had not occurred.

## AS AND FOR A THIRD CAUSE OF ACTION

*Unjust Enrichment*

196.    Plaintiff repeats and re-alleges each and every allegation contained in this Complaint as if fully set forth herein.

197.    Because Plaintiffs' performance under the Loan documents is excused by Defendant's material breach of the Loan Agreement, Plaintiffs have legal ownership over the Subject Property and an immediate right to possession.

198.    Defendant initiated a foreclosure action and is pursuing the process to unjustly obtain ownership rights to and possession of the Subject Property.

199.    As part of that litigation and process, Defendant obtained a rent receiver for the Subject Property based on the manufactured Events of Default and default conditions.

23

Case 1:24-cv-09979-KPF     Document 1-1     Filed 12/27/24     Page 27 of 29

200.    By obtaining the rent receiver, Defendant exercised and is continuing to exercise unauthorized dominion and control over the Subject Property to the exclusion of Plaintiffs' rights.

201.    It defies equity and good conscience to permit Defendant to retain control over the Subject Property.

202.    By manufacturing the Events of Default and default conditions, Defendant collected interest at the default interest rate.

203.    Because Defendant caused the default conditions, it defies equity and good conscience to permit Defendant to retain the interest collected at the default interest rate.

204.    As a result of Defendant's unjust enrichment, Plaintiffs should be awarded equitable relief in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION

*Breach of Fiduciary Duty*

205.    Plaintiff repeats and re-alleges each and every allegation contained in this Complaint as if fully set forth herein.

206.    CTC went beyond an ordinary debtor-creditor relationship and took actual, participatory control of FLO's business thereby creating a fiduciary relationship with Plaintiffs.

207.    As Plaintiffs' fiduciary, CTC owed Plaintiffs duties of care, honesty, loyalty and to act in Plaintiffs' best interests.

208.    As described above, Defendant breached its fiduciary duties by:

a.    Causing tenants to withhold rent;

b.    Causing the Subject Property to incur violations from the borough of Fort Lee;

c.    Miscalculating the insurance constant and withdrawing overages from the Cash Management Account;

d.    Leaving the Subject Property in disrepair;

24

e.   Failing to ensure operating expenses were covered; and

f.   Filing a foreclosure action.

209.    As a result of CTC's breaches of fiduciary duties, Plaintiffs were damaged in an amount to be determined at trial.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays for judgment in its favor as follows:

(a)    On the First Cause of Action against Defendant for breach of contract, compensatory damages in an amount to be determined at trial, believed to be no less than $250 million;

(b)    On the Second Cause of Action against Defendant for breach of the implied covenant of good faith and fair dealing, compensatory damages in an amount to be determined at trial;

(c)    On the Third Cause of Action against Defendant for unjust enrichment, equitable relief in an amount to be determined at trial;

(d)    On the Fourth Cause of Action against Defendant for breach of fiduciary duty, compensatory damages in an amount to be determined at trial; and

(e)    Such further relief as the Court deems just and necessary.

Dated: November 25, 2024
New York, New York

Respectfully submitted,
**JACOBS P.C.**

By: */s/ Muriel Raggi*

Muriel Raggi, Esq.
595 Madison Avenue
39th Floor
New York, New York 10022
(212) 229-0476
muriel@jacobspc.com

*Attorneys for Plaintiffs*
*Fort Lee Office LLC and*
*Meyer Chetrit*

25

## VERIFICATION

Muriel Raggi, an attorney duly admitted to practice before the Courts in the State of New York, hereby affirms, under the penalties of perjury, as follows:

1.    That deponent is the attorney for the plaintiff in the action within; that deponent has read the foregoing VERIFIED COMPLAINT and knows the contents thereof; that the same is true to deponent's own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes it to be true.

2.    The reason this verification is not made by plaintiff and is made by deponent is that plaintiff does not reside in the county where the attorneys for the plaintiff have their office.

3.    Deponent further says that the source of deponent's information and the grounds of deponent's belief as to all matters not stated upon deponent's knowledge are from investigations made on behalf of said plaintiff.

Dated: November 25, 2024
      New York, New York

*/s/ Muriel Raggi*
Muriel Raggi, Esq.

26